**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **IN RE ERICSSON INC. DATA BREACH LITIGATION**<br>This Document Relates To: ALL ACTIONS | Master File No. 4:26-CV-266-SDJ<br><br>**CONSOLIDATED CLASS ACTION PETITION**<br><br>**JURY TRIAL DEMANDED** |

# CONSOLIDATED CLASS ACTION PETITION

Plaintiffs Christopher Gray, Anthony Ross, Sisy Orobitg, and Diane Taylor ("Plaintiffs"), individually and on behalf of all other similarly situated individuals (the "Class" or "Class Members" as defined below) by and through their undersigned counsel, file this Consolidated Class Action Petition against Defendant Ericsson, Inc. ("Ericsson" or "Defendant"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by counsel as to all other matters:

## INTRODUCTION

1. On or around November 10, 2025, Ericsson was notified that Plaintiffs' and the Class's sensitive personally identifiable information ("PII"), which Ericsson was responsible for collecting, maintaining, protecting, securing, and safeguarding, was exposed to cyber criminals in a massive and preventable data breach affecting approximately 15,661 individuals (the "Data Breach" or "Breach").[1] Between April 17, 2025, and April 22, 2025, the unauthorized third-party had unfettered access to Plaintiffs' and the Class's highly sensitive and confidential PII where it was being inexplicably stored without sufficient data security and without sufficient oversight

[1] https://www.bleepingcomputer.com/news/security/ericsson-us-discloses-data-breach-after-service-provider-hack/ (last visited May 15, 2026).

from Ericsson. The confidential information exposed in the Data Breach includes Plaintiffs' and the Class's names, government-issued ID's, addresses, Social Security numbers, driver's license numbers, financial account information, and dates of birth.[2] Plaintiffs and the Class will face an imminent risk of identity theft and fraud for the rest of their lives.

2. "Ericsson holds personal data for employees and customers and, from time to time, shares this information with the company's service providers."[3] Defendant required Plaintiffs and Class Members to provide it with their PII in order to receive services and/or employment. After gathering Plaintiffs' and the Class's PII, Ericsson became directly responsible for ensuring that Ericsson, or any party hired by Ericsson, provided and maintained adequate data security practices, procedures, protocols, and infrastructure. Ericsson also became directly responsible for ensuring Plaintiffs' and Class Members' PII was protected and stored where unauthorized third parties could not gain unauthorized access.

3. Defendant hired its third-party vendor/service provider to maintain, store, and protect the PII Defendant collected in relation to cloud application, mobility, and broadband services. Through this relationship, Ericsson's service provider collected and maintained and/or was given access to the PII of Plaintiffs and the Class.

4. Ericsson was negligent and/or failed to confirm when hiring its service provider that Plaintiffs' and Class Members' PII would be protected from unauthorized access, that Ericsson's service provider maintained adequate data security, procedures, practices, infrastructure, and protocols, and that Plaintiffs' and the Class's PII would not be exposed to data breaches.

---

[2] https://cybermagazine.com/news/ericsson-data-breach (last visited May 15, 2026).
[3] *Breach Notice Letter,* OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3658 (last visited May 4, 2026).

5. On or around November 10, 2025, Ericsson's service provider it negligently hired and negligently supervised, informed Ericsson that certain data associated with Ericsson was impacted by the incident.[4] Ericsson's service provider conducted an investigation which was completed on February 23, 2026, at which time the service provider determined that personal information for Ericsson's customers and employees was contained within the affected files in the Breach.[5]

6. Despite learning of the Data Breach in or around November 2025, Ericsson chose not to cause notice to be given to Plaintiffs and the Class until March 9, 2026—*four* months later—when Defendant began mailing notice letters ("Notice Letter") to affected individuals, including Plaintiffs.[6]

7. The Notice Letters sent to Plaintiffs and Class Members failed to explain why it took four months (from November 10, 2025, to March 9, 2026) to alert Class Members that their sensitive PII had been exposed in the Data Breach. As a result of this delayed response, Plaintiffs and Class Members were unaware that their PII had been compromised, and that they were, and continue to be, at significant risk to identity theft and various other forms of personal, social, and financial harm.

8. Due to Defendants' negligent and/or careless acts and omissions, and due to their utter failure to protect Class Members' sensitive data, Plaintiffs' and Class Members' unencrypted, unredacted PII was compromised. Hackers obtained Plaintiffs' and the Class's PII because of its value in exploiting and stealing their identities. The risks to Plaintiffs and the Class will remain for their respective lifetimes.

---

[4] *Id.*
[5] *Id.*
[6] Exhibit 1 – Notice of Data Security Incident letter

9. Plaintiffs bring this class action lawsuit on behalf of the class they seek to represent, on behalf of all persons whose PII was compromised due to Ericsson's failure to: (i) ensure Ericsson and its service provider adequately protected Plaintiffs' and Class Members' PII; (ii) select a technology services provider with adequate data security, procedures, practices, infrastructure, and protocols; (iii) investigate its service provider's data security measures and practices prior to hiring its service provider to ensure they were adequate; (iv) supervise its service provider's data security measures during the course of their relationship; (v) warn Plaintiffs and Class Members of its service provider's inadequate information security practices; (vi) ensure Ericsson and its service provider monitored their network for security vulnerabilities and incidents; and (vii) give timely notice of the Data Breach to Plaintiffs and the Class.

10. The negligence of Ericsson violates federal and state statutes, regulations, and security procedures and guidelines.

11. As a result of Defendant's actions and/or inactions described herein, Plaintiffs and Class Members have suffered injuries. The injuries they have suffered include: (i) diminished or lost value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; change their usernames and passwords on their accounts; investigate, correct and resolve unauthorized transactions, and (v) the continued and certainly an increased risk to their PII, which remains in Defendant's and its service provider's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their PII. These risks will remain for the lifetimes of Plaintiffs

and Class Members.

12. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before this Data Breach, the Private Information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their Private Information is permanently exposed and unsecure.

## THE PARTIES

13. Plaintiff Christopher Gray is a natural person and citizen of Winchester, Indiana. He is domiciled in Indiana, where he intends to remain.

14. Plaintiff Anthony Ross is a natural person and citizen of Frisco, Texas. He is domiciled in Texas, where he intends to remain.

15. Plaintiff Sisy Orobitg is a natural person and citizen of Conroe, Texas. She is domiciled in Texas, where she intends to remain.

16. Plaintiff Diane Taylor is a natural person and citizen of Desoto, Texas. She is domiciled in Texas, where she intends to remain.

17. Defendant, Ericsson Inc., is a Delaware corporation with its principal place of business located at 6300 Legacy Drive, Plano, Texas 75024.

## JURISDICTION & VENUE

18. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one member of the Class and Defendant are citizens of different states. And there are over 100 putative Class Members.

19. This Court has personal jurisdiction over Defendant because it is headquartered in Texas, regularly conducts business in Texas, and has sufficient minimum contacts in Texas.

20. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims

occurred in this District.

## FACTUAL ALLEGATIONS

***Defendant Collected and Stored the Private Information of Plaintiffs and the Class***

21. Defendant is a subsidiary of a multinational networking and telecommunications company headquartered in Stockholm, Sweden that provides cloud applications, mobility, and broadband services.[7]

22. As part of its business, Defendant receives and maintains the highly sensitive Private Information of thousands of its current and former employees and customers.

23. Defendant "Ericsson holds personal data of employees and other parties with whom it does business, and in the course of its business shares this information with service providers."[8]

24. In collecting and maintaining its employees' and customers' Private Information, Defendant agreed it would safeguard the data in accordance with state law and federal law. Plaintiff and Class Members provided their Private Information to Ericsson with the reasonable expectation and mutual understanding that Ericsson would safeguard their Private Information against unauthorized disclosure.

25. Under state and federal law, businesses like Defendant's have duties to protect their current and former employees' and customers' Private Information and to notify them about breaches.

26. Defendant recognizes these duties, declaring in its "Privacy Notice" that it "is committed to supporting the right to privacy of people, as we lead the Information and

---

[7] *Data Breach Notices*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/d920097e-fba8-455c-b632-c7e115e5eb15.html (last visited May 4, 2026).

[8] https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3658 (last visited May 13, 2026)

Communication Technology transformation across industries and enable a connected world."[9]

27. Additionally, Defendant details its "privacy principles," which include:

a. "We implement policies, procedures and guidelines designed to achieve compliance with applicable laws."[10]

b. "We inform data subjects how their personal data will be collected and processed."[11]

c. "We process personal data only where there is a valid legal basis for processing."[12]

d. "We share personal data (within and outside Ericsson) only in accordance with our policies, procedures and guidelines."[13]

e. "We take appropriate measures so that the personal data we process is adequate, relevant, and limited to what is necessary in relation to the purposes for which it is processed, and that the data is accurate and, where necessary, kept up to date."[14]

f. "We take measures to consider privacy when designing and building products and services."[15]

g. "We adhere to the Ericsson Group standard security measures, including appropriate technical and organizational measures to protect personal

---

[9] *Privacy*, ERICSSON, https://www.ericsson.com/en/legal/privacy (last visited May 4, 2026).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

data."[16]

h. "We respect applicable data subject rights."[17]

***Defendant's Data Breach***

28. Despite its representations on its Privacy Notice, Defendant failed to adequately protect Plaintiffs' and Class Members' Private Information, sharing it with a third-party vendor without ensuring that the third-party vendor enacted appropriate and reasonable cybersecurity measures.

29. On or around April 28, 2025, Defendant's service provider used by Defendant discovered it had been hacked in the Data Breach.[18]

30. Worryingly, Defendant's service provider's investigation revealed that "a limited amount of information may have been acquired without authorization between April 17, 2025, and April 22, 2025."[19]

31. Defendant represents that it was informed of the Data Breach on November 10, 2025, by its service provider, and then proceeded to issue notice to those affected by approximately February 23, 2026.[20]

32. Thus, during the six-day Data Breach, cybercriminals were able not only to access Plaintiffs' and the Class's Private Information, but they were able to acquire and exfiltrate it from Defendant's service provider's systems.

33. Because of Defendant's Data Breach, and according to the Attorney General of

---

[16] *Id.*
[17] *Id.*
[18] https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3658 (last visited May 8, 2026)
[19] *Id.*
[20] *Id.*

Texas's "Data Security Breach Reports,"[21] at least the following types of Private Information may have been compromised:

a. Name of individual;

b. Address;

c. Social Security Number Information;

d. Driver's License number;

e. Government-issued ID number (e.g., passport, state ID card);

f. Financial Information (e.g., account number, credit or debit card number);

g. Medical Information; and

h. Date of Birth.

34. In total, Defendant injured at least 15,661 persons—via the exposure of their Private Information in the Data Breach.[22] Upon information and belief, these 15,661 persons include Defendant's employees and customers.

35. And yet, Defendant waited until March 9, 2026, before it began mailing notice of Data Breach letters to the Class—an entire year after the Data Breach was discovered.[23] After conducting an investigation, which concluded on February 23, 2026, it was determined that Plaintiffs' and Class members' names and Social Security numbers were exposed in the Data Breach. However, Ericsson did not disclose the cause(s) of the Data Breach, what remedial measures Ericsson took to protect Plaintiffs' and Class Members' Private information from further

[21] *Data Security Breach Reports*, KEN PAXTON ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited May 4, 2026).
[22] *Data Breach Notices*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/d920097e-fba8-455c-b632-c7e115e5eb15.html (last visited May 4, 2026).
[23] Ex. 1.

disclosure, or why it took Ericsson months after being notified of the Data Breach to notify Plaintiffs and Class Members.

36. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

37. And when Defendant did notify Plaintiffs and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiffs and the Class to sign up for credit monitoring services and to "follow the recommendations on the following page to help protect your personal information."[24]

38. Ericsson made a token gesture of a mere twelve (12) months of credit monitoring and dark web monitoring services to Plaintiffs and the Class – an offer it need not have provided absent any threat to Plaintiffs and the Class.[25] However, this offer is woefully inadequate considering Plaintiffs and Class Members will be at a continued risk of fraud and identity theft for the rest of their lives. This gesture does not and will not fully protect Plaintiffs and the Class from cybercriminals and is largely ineffective against protecting data after it has been stolen. Cybercriminals are fully aware of the well-publicized preventative measures taken by entities after data breaches such as that which happened here and will, therefore, oftentimes hold onto the stolen data and not use it until after the complimentary service is no longer active, and long after victim concerns and preventative steps have diminished.

39. Upon information and belief, the unauthorized third-party cybercriminals intentionally targeted and gained access to the PII with the intent of engaging in misuse of the PII,

[24] *Id.*
[25] *Id.*

including marketing and selling Plaintiffs' and Class Members' PII to fraudsters as that is the *modus operandi* of data thieves.

40. The Notice Letter provided by Ericsson fails to provide the consolation Plaintiffs and Class Members seek and certainly falls far short of eliminating the substantial risk of fraud and identity theft Plaintiffs and the Class now face.

41. Plaintiffs' and Class Members' information is likely for sale on the dark web. Their PII could also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and/or Class Members. Either way, unauthorized individuals can easily access and misuse the PII of Plaintiffs and Class Members.

42. Defendant failed its duties when its inadequate security practices caused the Data Breach. Specifically, Defendant's negligence is evidenced by its provision of Private Information to a third-party service provider without ensuring adequate cybersecurity was in place to prevent the Data Breach and stop cybercriminals from accessing the Private Information. And thus, Defendant caused widespread injury and monetary damages.

43. Since the Data Breach, Defendant claims that it "implemented measures to enhance security and minimize the risk of a similar incident occurring in the future."[26]

44. But such simple declarations are insufficient to ensure that Plaintiffs' and Class Members' Private Information will be protected from additional exposure in a subsequent data breach.

45. Further, the Notice of Data Breach indicates that Defendant has not disclosed—and may be unable to determine—the full scope of the Data Breach, including precisely what information was accessed or when such access occurred within Defendant's third-party provider's

[26] *Id.*

systems.

46. Because of Defendant's Data Breach, the sensitive Private Information of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

***Plaintiffs' Experiences and Injuries***

**Plaintiff Christopher Gray**

47. Plaintiff Christopher Gray is a former employee of Defendant, whose Private Information was collected, obtained, and maintained by Defendant in connection with his employment.

48. Thus, Defendant collected, obtained, and maintained Plaintiff's Private Information, including by providing or entrusting such information to third-party providers.

49. As a result of Defendant's failure to adequately safeguard Plaintiff's Private Information, including while entrusted to third-party providers, Plaintiff was injured by Defendant's Data Breach.

50. Plaintiff is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

51. As a condition of his employment with Defendant, Plaintiff provided Defendant with his Private Information. Defendant used that Private Information to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that Private Information in order to obtain employment and payment for that employment.

52. Plaintiff provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant and its third-party vendors obtained and continue to maintain

Plaintiff's Private Information. Defendant has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure, including when entrusted to third-party vendors.

53. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of Private Information.

54. Plaintiff received a Notice of Data Breach dated March 9, 2026.

55. Thus, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

56. Through the Data Breach, Defendant compromised Plaintiff's Private Information.

57. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiffs to take those steps in its Data Breach Notice.

58. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

59. Because of the Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

60. Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

61. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—

property that Defendant was required to adequately protect.

62. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because of the Data Breach, which exposed Plaintiff's Private Information to third parties and placed it right in the hands of criminals.

63. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

64. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's and its third-party vendor's possession—is protected and safeguarded from additional breaches.

**Plaintiff Anthony Ross**

65. Plaintiff Anthony Ross is a former employee of Defendant, whose Private Information was collected, obtained, and maintained by Defendant in connection with his employment.

66. Thus, Defendant collected, obtained, and maintained Plaintiff's Private Information, including by providing or entrusting such information to third-party providers.

67. As a result of Defendant's failure to adequately safeguard Plaintiff's Private Information, including while entrusted to third-party providers, Plaintiff was injured by Defendant's Data Breach.

68. Plaintiff is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

69. As a condition of his employment with Defendant, Plaintiff provided Defendant with his Private Information. Defendant used that Private Information to facilitate its employment

of Plaintiff, including payroll, and required Plaintiff to provide that Private Information in order to obtain employment and payment for that employment.

70. Plaintiff provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant and its third-party vendor obtained and continue to maintain Plaintiff's Private Information. Defendant has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure, including when entrusted to third-party vendors.

71. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of Private Information.

72. Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

73. Defendant deprived Plaintiff Ross of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

74. Thus, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

75. Through the Data Breach, Defendant compromised Plaintiff's Private Information.

76. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

77. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

78. Because of the Data Breach, Plaintiff has suffered—and will continue to suffer

from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

79. Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

80. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

81. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because of the Data Breach, which exposed Plaintiff's Private Information to third parties and placed it right in the hands of criminals.

82. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

83. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's and its third-party vendor's possession—is protected and safeguarded from additional breaches.

**Plaintiff Sisy Orobitg**

84. Plaintiff Sisy Orobitg is a former employee of Defendant, whose Private Information was collected, obtained, and maintained by Defendant in connection with his employment.

85. Thus, Defendant collected, obtained, and maintained Plaintiff's Private Information, including by providing or entrusting such information to third-party providers.

86. As a result of Defendant's failure to adequately safeguard Plaintiff's Private Information, including while entrusted to third-party providers, Plaintiff was injured by

Defendant's Data Breach.

87. Plaintiff is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. She is careful to store any documents containing her Private Information in a secure location.

88. As a condition of her employment with Defendant, Plaintiff provided Defendant with her Private Information. Defendant used that Private Information to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that Private Information in order to obtain employment and payment for that employment.

89. Plaintiff provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant and its third-party vendors obtained and continue to maintain Plaintiff's Private Information. Defendant has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure, including when entrusted to third-party vendors.

90. Plaintiff reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of Private Information.

91. Plaintiff received a Notice of Data Breach dated March 9, 2026.

92. Thus, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

93. Through the Data Breach, Defendant compromised Plaintiff's Private Information.

94. Plaintiff has spent at least ten (10) hours—and will continue to spend—significant time and effort mitigating the consequences of the Data Breach, including filtering through spam

emails and calls and monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiffs to take those steps in its Data Breach Notice.

95. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails and phone calls. Specifically, starting around January 2026, Plaintiff estimates she receives approximately 2-3 spam emails per week related to resetting account passwords and phishing emails attempting to obtain additional information from Plaintiff, and approximately 10 spam calls per week related to the sale of products and services Plaintiff did not request. To date, Plaintiff still receives these unsolicited communications. Plaintiff attributes these unsolicited communications to the Data Breach based on temporal proximity, her careful handling of Private Information, and the fact that these unsolicited communications are atypical in Plaintiff's experience.

96. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

97. Because of the Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

98. Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

99. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

100. Plaintiff suffered imminent and impending injury arising from the substantially

increased risk of fraud, misuse, and identity theft—all because of the Data Breach, which exposed Plaintiff's Private Information to third parties and placed it right in the hands of criminals.

101. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate her injuries.

102. Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's and its third-party vendor's possession—is protected and safeguarded from additional breaches.

**Plaintiff Diane Taylor**

103. Plaintiff Diane Taylor is a former employee of Defendant, whose Private Information was collected, obtained, and maintained by Defendant in connection with her employment.

104. Thus, Defendant collected, obtained, and maintained Plaintiff's Private Information, including by providing or entrusting such information to third-party providers.

105. As a result of Defendant's failure to adequately safeguard Plaintiff's Private Information, including while entrusted to third-party providers, Plaintiff was injured by Defendant's Data Breach.

106. Plaintiff is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. She is careful to store any documents containing her Private Information in a secure location.

107. As a condition of her employment with Defendant, Plaintiff provided Defendant with her Private Information. Defendant used that Private Information to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that Private Information in order to obtain employment and payment for that employment.

108. Plaintiff provided her Private Information to Defendant and trusted the company

would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant and its third-party vendors obtained and continue to maintain Plaintiff's Private Information. Defendant has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure, including when entrusted to Defendant's third-party vendors.

109. Plaintiff reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of Private Information.

110. On information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

111. Through the Data Breach, Defendant compromised Plaintiff's Private Information.

112. Plaintiff has spent will continue to spend—significant time and effort monitoring his accounts to protect herself from identity theft.

113. Plaintiff Taylor has placed a freeze onto her credit reports in an effort to prevent unauthorized people/companies from opening accounts in her name. Despite the "freeze", Plaintiff Taylor spends time each month looking at her credit reports to make sure no unauthorized accounts are being opened.

114. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

115. Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

116. Plaintiff has noticed an uptick in spam phone calls and messages from parties with whom she has had no prior relationship.

117. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

118. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because of the Data Breach, which exposed Plaintiff's Private Information to third parties and placed it right in the hands of criminals.

119. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate her injuries.

120. Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's and its third-party vendor's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

121. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[27] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[28]

[27] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 16, 2026).
[28] *Id*. at 3.

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[29]

c. 89% of consumers stated that "I care about data privacy."[30]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[31]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[32]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[33]

***Plaintiff and the Proposed Class Suffered Common Injuries and Damages***

122. Because of Defendant's failure to adequately safeguard Plaintiffs' and Class Members' Private Information, including while entrusted to a third-party provider, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their Private Information is used;

b. diminution in value of their Private Information;

c. compromise and continuing publication of their Private Information;

[29] *Id*.
[30] *Id*. at 9.
[31] *Id*.
[32] *Id*.
[33] *Id*. at 11.

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen Private Information; and

h. continued risk to their Private Information—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

***Substantially Increased Risk of Identity Theft and Fraud***

123. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

124. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

125. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

126. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the

dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

127. The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[34] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web, the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[35] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

128. The unencrypted Private Information of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' Private Information.

129. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

130. In particular, the theft of Social Security numbers—in combination with other Private Information (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

---

[34] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).
[35] *Id.*

131. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[36] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[37]

132. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

133. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[38]

134. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

---

[36] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[37] *Id.*
[38] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

135. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

136. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

137. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[39]

138. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[40] These

---

[39] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[40] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be

dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen Private Information, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

139. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

140. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that

---

made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

year, resulting in more than $3.5 billion in losses to individuals and business victims.[41]

141. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their Private Information was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

142. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

143. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

144. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

[41] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

145. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

146. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[42]

147. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[43]

148. The risk posed by third-party vendors has also become increasingly acute in recent years.[44] As industry analysis explains, while "software vendors have long played a part in unintentionally increasing the attack surface for those who use their products and services," over the past "two to three years," this risk "has moved from the occasional (and typically minor to moderate) mishap to a much more widespread and insidious problem that can (and sometimes does) have a devastating effect on enterprises."[45] This evolution underscores that vendor- and service-provider-related vulnerabilities are a known and escalating cybersecurity risk across industries, including Defendant's.

149. Therefore, the increase in such attacks, and attendant risk of future attacks—

---

[42] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[43] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.
[44] *Verizon*, 2025 DATA BREACH INVESTIGATIONS REPORT (2025), https://www.verizon.com/business/resources/T254/reports/2025-dbir-data-breach-investigations-report.pdf.
[45] *Id*.

including through vulnerabilities introduced by vendors, contractors, parent company, and other third-party service providers—was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Could Have Prevented the Data Breach***

150. Data breaches are preventable.[46] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[47]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[48]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [49]

151. Defendant could and should have prevented the Data Breach by ensuring both it and its vendor protected the files and servers containing Plaintiffs' and Class Members' Private Information and were properly secured and encrypted but failed to do so.

---

[46] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).
[47] *Id.* at 17.
[48] *Id.* at 28.
[49] *Id.*

152. Defendant failed to take, and failed to ensure its third-party vendor took, the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access and exploitation.

***Defendant Failed to Comply with Federal Trade Commission Requirements.***

153. Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices.

154. According to the FTC, the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

155. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[50] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

156. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

[50] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

157. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

158. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

159. Defendant and its third-party vendor(s) failed to follow FTC guidelines and industry standards for safeguarding and protecting the Private Information of Plaintiffs and Class Members against unauthorized disclosures to third parties.

160. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its employees' and customers' data, including when such information was entrusted to a third-party provider, constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

161. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant's. These industry standards include: educating all

employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

162. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; protecting against any possible communication system; and training staff regarding critical points.

163. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including, without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

164. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

165. Plaintiffs bring this class action on behalf of themselves and all others similarly situated.

166. The proposed class is defined as:

> All individuals residing in the United States whose Private Information was compromised in the Data Breach discovered by

> Ericsson in November 2025, including all those individuals who were sent notice of the Data Breach.

167. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

168. Plaintiffs reserve the right to amend the Class definition.

169. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

170. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

171. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 15,661 individuals.

172. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

173. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

174. Commonality and Predominance. Plaintiffs' and the Class's claims raise

predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class-wide proceeding can answer for all Class Members. In fact, a class-wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's Private Information;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing Private Information;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's Private Information;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

175. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would

be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

176. Plaintiffs re-allege and incorporate by reference factual paragraphs 1-175 as if fully set forth herein.

177. Defendant solicited, gathered, and stored the PII of Plaintiffs and Class Members, which was in turn provided to Defendant's third-party service provider so that the service provider could provide technology services to Defendant. Plaintiffs and the Class (or their third-party agents) entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

178. By collecting and maintaining sensitive PII, Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security or ensure that its third-party vendor(s) did so—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

179. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if their Private Information were wrongfully disclosed. Defendant had a duty to Plaintiffs and Class Members to exercise reasonable care in selecting, monitoring, and ensuring any technology service providers it hired used adequate data security, procedures, and protocols to prevent foreseeable harm to Plaintiffs and the Class.

180. Defendant had a common law duty to exercise reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when selecting a technology provider. This duty included taking action to ensure Defendant's service provider adequately safeguarded such data, that Defendant's service provider was aware of its security requirements, and that Defendant's service provider implemented security requirements to meet federal and state law requirements. Defendant utterly failed to do any of the above.

181. Defendant was also responsible for providing timely notification of the Data Breach to Plaintiffs and Class Members but failed to do so.

182. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class Members' Private Information.

183. Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a. ensure both it and its vendor protected the files and servers containing Private Information and were properly secured and encrypted;

b. exercise reasonable care in handling and using the Private Information in its care and custody;

c. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

d. promptly detect attempts at unauthorized access;

e. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

184. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

185. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information that it was no longer required to retain under applicable regulations.

186. Defendant knew or reasonably should have known that the failure to exercise due care in the collection, storage, and use of Plaintiffs' and Class Members' Private Information—including when such information was entrusted to third-party providers—involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

187. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendant with their confidential Private Information, a necessary part of obtaining employment from Defendant.

188. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

189. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and the Class Members' sensitive Private Information.

190. Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

191. Defendant failed to ensure that its third-party vendor followed applicable FTC guidelines and industry standards for safeguarding and protecting the Private Information of Plaintiffs and Class Members against unauthorized disclosures to third parties.

192. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, including when such information was entrusted to third-party providers, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

193. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that,

because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

194. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

195. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet those duties, including in safeguarding Private Information entrusted to third-party providers, and that such failures would cause Plaintiffs and Class Members to suffer the foreseeable harms associated with the exposure of their Private Information.

196. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information —whether by malware or otherwise.

197. Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiffs and Class Members and the importance of exercising reasonable care in handling it.

198. Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

199. Defendant breached these duties as evidenced by the Data Breach.

200. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' Private Information by:

a. disclosing and providing access to this information to unauthorized third parties; and

b. failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

201. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiffs and Class Members, which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

202. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

203. Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

204. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

205. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

206. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private

Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

207. Plaintiffs re-allege and incorporate by reference factual paragraphs 1-175 as if fully set forth herein.

208. Plaintiffs and Class Members entered into employment relationships with Defendant—and/or were third-party beneficiaries of contracts with Defendant— and, in connection with those relationships, provided their Private Information to Defendant. In turn, Defendant provided Plaintiff's and Class Members' Private Information to Defendant's third-party service provider.

209. Plaintiffs and Class Members were required to provide their Private Information to Defendant as a condition of receiving employment and/or services provided by Defendant. Plaintiffs and Class Members provided their Private Information to Defendant and/or its third-party agents in exchange for employment and related benefits, with the reasonable expectation and mutual understanding that Defendant would safeguard their Private Information from unauthorized disclosure.

210. To the extent Defendant entered into agreements with third-party service providers in connection with the provision of employment-related services and benefits, Plaintiffs and Class Members were intended third-party beneficiaries of those agreements.

211. Plaintiffs and Class Members reasonably understood that Defendant would use a portion of funds derived from their labor to pay for reasonable cybersecurity measures, including in connection with any third-party service providers, to protect their Private Information.

212. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide, including when such information was processed or stored by third-party service providers, based on Defendant's duties under state and federal law and its internal policies.

213. Plaintiffs and the Class Members accepted Defendant's offers by disclosing their Private Information to Defendant or its third-party agents in exchange for employment.

214. In turn, and through internal policies, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

215. In its Privacy Policy, Defendant represented that it had a legal duty to protect Plaintiffs' and Class Members' Private Information.

216. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

217. After all, Plaintiffs and Class Members would not have entrusted their Private Information to Defendant or its third-party agents in the absence of such an agreement with Defendant.

218. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

219. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair

dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

220. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

221. Defendant materially breached the contracts it entered into with Plaintiffs and Class Members by:

a. failing to safeguard their information, including while entrusted to third-party service providers;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

222. In these and other ways, Defendant violated its duty of good faith and fair dealing.

223. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

224. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

225. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

226. Plaintiffs re-allege and incorporate by reference factual paragraphs 1-175 as if fully set forth herein.

227. This claim is pleaded in the alternative to the breach of implied contract claim.

228. Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their Private Information to facilitate business, and (2) funds generated from Plaintiffs' employment.

229. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

230. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect their Private Information that they were required to provide, including when such information was processed or stored by third-party service providers, based on Defendant's duties under state and federal law and its internal policies.

231. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

232. Instead of providing a reasonable level of security or retention policies that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

233. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) Private Information and (2) funds generated from their employment, because Defendant failed to adequately protect their Private Information.

234. Plaintiffs and Class Members have no adequate remedy at law.

235. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

236. Plaintiffs re-allege and incorporate by reference factual paragraphs 1-175 as if fully set forth herein.

237. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

238. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

239. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable

data security to secure the data entrusted to it;

240. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

a. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

b. Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

241. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

242. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

243. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs' and Class Members' injuries.

244. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

245. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed

Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

D. Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen Private Information;

E. Awarding Plaintiffs and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiffs and the Class leave to amend this consolidated class action petition to conform to the evidence produced at trial; and

J. Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: May 27, 2026

Respectfully submitted,

By: /s/ *Raina C. Borrelli*

Raina C. Borrelli (*Pro Hac Vice*)
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

William B. Federman
Tex. Bar No. 00794935
Jessica A. Wilkes
**FEDERMAN & SHERWOOD**
4131 North Central Expressway, Ste. 900
Dallas, Texas 74204
Telephone: (800) 237-1277
E: wbf@federmanlaw.com
E: jaw@federmanlaw.com

*Interim Class Counsel*

Andre R. Belanger (MS. Bar. No: 104077)
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: andre.belanger@poulinwilley.com
cmad@poulinwilley.com

*Additional Plaintiffs' Counsel*

**CERTIFICATE OF SERVICE**

I, Raina C. Borrelli, hereby certify that on May 27, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, via the ECF system.

DATED this 27th day of May, 2026.

STRAUSS BORRELLI PLLC

By: */s/ Raina C. Borrelli*

Raina C. Borrelli
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com